Fee Paid

FILED
CLERK, U.S. DISTRICT COURT

4/15/24

CENTRAL DISTRICT OF CALIFORNIA
BY: ___CS___ DEPUTY

Arthur Egbert. Fisher, Esq.
A. Fisher Legal Services, Inc., A.P.C.
Registered California Law Corporation
P.O. Box 455 Hailey ID 83333
art@baylaw.com; (208) 309-0357
Attorney for Qui-Tam Plaintiff
TAXPAYERS AGAINST FRAUD, LLC

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

CV24-3043-CBM(AJRx)

| | |
|---|---|
| UNITED STATES OF AMERICA, _ex rel._ TAXPAYERS AGAINST FRAUD, LLC, <br><br> Plaintiff, <br><br> vs. <br><br> LIFELONG LEARNING ADMINISTRATION CORPORATION, ANTELOPE VALLEY LEARNING ACADEMY INC., ALTA VISTA PUBLIC CHARTER, INC., CRESCENT VIEW SOUTH INC., CRESCENT VIEW WEST PUBLIC CHARTER INC., DESERT SANDS PUBLIC CHARTER, INC., DIEGO PLUS EDUCATION CORPORATION, MISSION VIEW PUBLIC CHARTER INC., SIERRA EDUCATIONAL ADVANCEMENT CORPORATION, VISTA REAL PUBLIC CHARTER, INC., and WESTERN EDUCATIONAL CORPORATION <br> Defendants. | **COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT** <br><br> **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 [DO NOT PLACE ON PACER]** <br><br> **PLAINTIFF DEMANDS TRIAL BY JURY** <br><br> Case No. <br><br> Judge: |

## COMPLAINT

### i. Introduction

1.    This is a _qui tam_ action filed under the False Claims Act, 31 U.S.C. § 3729, _et seq._ (the "FCA"), arising from false and fraudulent statements, certifications, and conduct of Defendants in connection with application for, receipt and retention of Paycheck Protection Program ("PPP") funds arising out of and during the coronavirus, COVID-19 pandemic.

2.     In the face of the coronavirus pandemic, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), which included the PPP, a program implemented by the United States Small Business Administration ("SBA") with support from the Department of the Treasury.  The Paycheck Protection Program authorized loans to small businesses, enabling them to retain workers and pay certain other expenses through the severe economic disruption caused by the coronavirus pandemic.

3.     The SBA passed rules limiting the types of borrowers who were eligible to receive PPP loans and eligible for forgiveness of those loans. These included limitations based on employee headcount, revenue volume, net worth, and other factors, all designed to ensure that the loans would serve to help struggling small businesses to keep their workers on payroll. Yet, as detailed below, the PPP program invited fraud on the part of borrowers such as Defendants, who were not in fact or at-law eligible for loan receipt and/or forgiveness, but who believed they were unlikely to get caught when misrepresenting their eligibility to receive this emergency funding.

4.     This action alleges that each Defendant was both factually and legally ineligible to receive PPP funds under the underwriting standards established by the SBA eligibility rules.  Plaintiff will show, using factual and evidentiary proof, that Defendants fraudulently applied for and received PPP loans in violation of the False Claims Act and/or fraudulently requested and received PPP loan forgiveness.

5.     This Action is brought by relator, Taxpayers Against Fraud, LLC,("Relator") on behalf of the United States of America (the "United States" or the "Government") and against named defendants, Lifelong Learning Administration Corporation, Antelope Valley Learning Academy Inc., Alta Vista Public Charter, Inc., Crescent View South Inc., Crescent View West Public Charter Inc., Desert Sands Public Charter, Inc., Diego Plus Education Corporation, Mission View Public Charter Inc., Sierra Educational Advancement Corporation, Vista Real Public Charter, Inc., and Western

Educational Corporation, alleging violations of the FCA. Relator claims entitlement to a portion of any recovery obtained by the United States as a *qui tam* plaintiff authorized by 31 U.S.C. § 3730.

6.    Through this action, Relator seeks to recover millions of dollars in damages and civil penalties on behalf of the United States of America arising out of Defendants' and/or their agents and employees' multiple false and fraudulent applications, certifications, representations, records, statements and claims, which were made and/or caused to be made to the SBA or its approved lenders, in order to procure PPP loans and/or to achieve forgiveness of PPP loans, in direct violation of the FCA.

7.    As a direct result of their false and fraudulent statements, applications, certifications, and representations to the SBA and its approved lenders, Defendants collectively obtained more than thirty-two million U.S. Dollars ($32,000,000.00) in PPP loans that they were not eligible to receive.

8.    In October 2009, the Government Accountability Office released Report 10-108, which states, "By failing to hold firms [i.e. fraudulent borrowers] accountable, SBA and contracting agencies have sent a message to the contracting community that there is no punishment or consequences for committing fraud." This suit is an effort to assist the SBA in fulfilling its objective of holding fraudulent, non-entitled PPP borrowers accountable to well-defined and easily understood lending standards[1] and to recoup the Government's monetary losses resulting from Defendants' fraudulent acquisition of PPP loan funds.

## II.    Parties, Jurisdiction, and Venue

9.    Relator Taxpayers Against Fraud, LLC, is a Wyoming Limited Liability Company (herein the "Relator" or "Plaintiff"), formed and dedicated to providing fraud notification to the Government through the U.S. SBA Office of Inspector General (SBA-OIG) and the United States Department of Justice (DOJ), for the ultimate benefit of the U.S. Treasury and taxpayers. Relator has

---

[1] *Case Studies Show Fraud and Abuse Allowed Ineligible Firms to Obtain Millions of Dollars.* https://www.gao.gov/assets/gao-10-108.pdf

engaged in extensive research and investigations to compile evidence, data, information and documentation concerning Defendants fraudulent PPP loans to provide that evidence to government attorneys, agencies and prosecutors, inclusive of the DOJ and SBA, to recover damages and civil penalties from the fraudulent PPP borrowers.

10.     All defendants named in this Complaint operate under law as non-profit organizations, exempt from state and federal tax obligations.  A non-profit organization is organized for purposes other than generating profit and in which no part of the organization's income is distributed to its members, directors, or officers.  Plaintiff is informed and believes and thereon alleges that all Defendants herein have enjoyed that tax-exempt status while applying for and receiving the fraudulently induced PPP loans at issue here.

11.     Some states, including California, have adopted the Revised Model Nonprofit Corporation Act (1986). A state's own statutes must specifically be examined to determine application of the law in that state. Under the Revised Model Nonprofit Corporation Act (1987) § 14.30, a court may dissolve a non-profit corporation (1) in a proceeding by the attorney general if it is established that the corporation has continued to exceed or abuse the authority conferred upon it by law; or if the directors or those in control of the corporation have acted, are acting or will act in a manner that is illegal, oppressive or fraudulent.

12.     Other consequences that may result from a not-for-profit's fraudulent conduct include: 1) a non-profit's inability to receive tax-deductible contributions; 2) revocation of non-profit status; 3) potential imposition of back taxes; and 3) the individuals perpetrating the fraud may be subject to civil and/or criminal penalties.  The seriousness of these consequences underscores the importance of transparency, integrity, and lawful compliance with PPP loan eligibility and compliance rules by tax-exempt entities such as Defendants.

13.     Defendants, Lifelong Learning Administration Corporation, Antelope Valley Learning Academy Inc., Alta Vista Public Charter, Inc., Crescent View South Inc., Crescent View West

Public Charter Inc., Desert Sands Public Charter, Inc., Diego Plus Education Corporation, Mission View Public Charter Inc., Sierra Educational Advancement Corporation, Vista Real Public Charter, Inc., and Western Educational Corporation, and each of them, and their principals, agents, and employees, are California individuals, corporations or other legally formed entities, organized, existing, conducting business and having their principal place of business at 177 Holston Dr. Lancaster, CA 93535-4570, as stated on their PPP loan applications and their corporate registrations filed with the California Secretary of State. These individuals and entities reside in and/or operate within the geographic scope of, and are therefore subject to personal and/or subject matter jurisdiction in this judicial district and division, for the actions and inactions, and torts alleged in this Complaint.

14. This action arises under the False Claims Act, 31 U.S.C. §§ 3729-3733. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331(Federal Question) and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction in this District Court for actions brought under 31 U.S.C. §§ 3729 and 3730.

15. Plaintiff/Relator is informed and believes and thereon alleges that the information, allegations, and transactions involving Defendants that are the subject of this Complaint are not the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party.

16. Plaintiff/Relator is further informed and believes and thereon alleges that the information, allegations, and transactions that are the subject of this Complaint have not been "publicly disclosed" in any of the manners specified in 31 U.S.C. § 3730(e).[2] Moreover, even if such a public disclosure had occurred, of which Relator is unaware, Relator would be considered an "original source" for substantial information on which the allegations or transactions in this Complaint are based. 31 USC § 3730(e)(4)(B)(2).

---

[2] Section 3730(e)'s public-disclosure bar was once deemed jurisdictional in nature, but that is no longer the case after amendments to the FCA that were enacted in 2010 as part of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119, 901-02.

17.    Moreover, although the simple fact that the Defendants applied for and received PPP funding was publicly disclosed by the SBA, and possibly elsewhere, Taxpayers Against Fraud, LLC, through its extensive, independent research and investigation processes, has acquired, maintains and protects as private and confidential, unique and proprietary facts, data, information and knowledge, obtained independently from, and which materially add to any publicly disclosed information, allegations, facts or transactions. Taxpayers Against Fraud, LLC provided, from their proprietary database, independent and material information relating to this Complaint to the Government prior to filing this action, as required under 31 U.S.C. § 3730 (e)(4)(B)(2).

18.    Relator, through diligent use of its unique and proprietary database, compiled through extensive independent investigations, paid research, and requests using the Freedom of Information Act (FOIA), provides, in this sealed Complaint, certain invaluable and highly relevant, originally sourced documentary evidence and related factual information concerning each Defendant and their actions, which justifies the Government, acting through the USDOJ, in exercising its veto power over any defensive assertion of the public disclosure bar.[3]

19.    Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c), 28 U.S.C. §1395, and 31 U.S.C. § 3732(a), because Lifelong Learning Administration Corporation,  Antelope Valley Learning Academy Inc., Alta Vista Public Charter, Inc., Crescent View South Inc., Crescent View West Public Charter Inc., Desert Sands Public Charter, Inc., Diego Plus Education Corporation, Mission View Public Charter Inc., Sierra Educational Advancement Corporation, Vista Real Public Charter, Inc., and Western Educational Corporation can be found, reside, maintain their principal place(s) of business, and transact business within the geographic scope and jurisdiction of Western Division of the Central District of California Federal Court.

---

[3] In the alternative, even if a public disclosure did occur and Taxpayers Against Fraud, LLC fails to qualify as an original source, the Government has the sole veto power, under 31 U.S.C. § 3730(e)(4)(A), to oppose any motion to dismiss based on that public disclosure bar, and, in that circumstance, the action is not subject to dismissal. (In a recent decision, U.S. ex rel. Vermont National Telephone Co. v. Northstar Wireless LLC, No. 15-0728, __ F. Supp. 3d __, 2023 WL 7407301 (D.D.C. Nov. 19, 2023), a district court confirmed that the government's veto power over a dismissal based on the public disclosure bar of the False Claims Act (FCA) is absolute and can be effectuated by a mere notice of the government's opposition.)

COMPLAINT
6

20.    Pursuant to U.S.C. § 3730(b), this Complaint is to be filed *in camera* and to remain under seal for at least sixty days and shall not be served on any Defendant until the Court so orders. The Government may elect to intervene and proceed with the action within sixty days after the Government receives the Complaint or at such other time as the Court may order.

### III.    SBA Loan Facts

21.    Lifelong Learning Administration Corporation listed their address on their SBA loan application as 177 Holston Dr., Lancaster, CA 93535-4570. It is important to note that all ten remaining Defendants recorded the same address on their loan application, which is an indicia of common management. Lifelong Learning Administration Corporation received PPP loan #4825347103 on 4/13/2020 in the amount of $4,622,794. On 6/11/2021, this loan, including accrued interest, totaling $4,673,708, was forgiven.[4]    Lifelong Learning Administration Corporation operates on a fiscal year that begins on July 1 and ends on June 30.

22.    Antelope Valley Learning Academy, Inc., with an address listed on their SBA loan application of 177 Holston Dr., Lancaster, CA 93535-4570, received PPP loan #5021597107 on 4/13/2020 in the amount of $7,810,201. On 8/30/2021, this loan, including accrued interest, totaling $7,913,552, was forgiven. Antelope Valley Learning Academy, Inc. operates on a fiscal year that begins on July 1 and ends on June 30.

23.    Alta Vista Public Charter, Inc., with an address listed on their SBA loan application of 177 Holston Dr., Lancaster, CA 93535-4570, received PPP loan #6523537203 on 4/28/2020 in the amount of $1,718,765. On 8/20/2021, this loan, including accrued interest, totaling $1,740,803, was forgiven. Alta Vista Public Charter, Inc. operates on a fiscal year that begins on July 1 and ends on June 30.

24.    Crescent View South, Inc., with an address listed on their SBA loan application of 177 Holston Dr., Lancaster, CA 93535-4570, received PPP loan #5045907109 on 4/13/2020 in the

---

[4] https://data.sba.gov/dataset/ppp-foia# **The factual content of this link applies equally to all factual allegations in paragraphs 21 – 31.**

COMPLAINT

7

amount of $3,017,569. On 8/9/2021, this loan, including accrued interest, totaling $3,055,847, was forgiven. Crescent View South, Inc. operates on a fiscal year that begins on July 1 and ends on June 30.

25.    Crescent View West Public Charter Inc., with an address listed on their SBA loan application of 177 Holston Dr., Lancaster, CA 93535-4570, received PPP loan #4336977408 on 5/8/2020 in the amount of $2,276,562. On 8/30/2021, this loan, including accrued interest, totaling $2,305,877, was forgiven. Crescent View West Public Charter Inc. operates on a fiscal year that begins on July 1 and ends on June 30.

26.    Diego Hills Public Charter, Inc., with an address listed on their SBA loan application of 177 Holston Dr., Lancaster, CA 93535-4570, received PPP loan #6561197209 on 4/28/2020 in the amount of $1,001,397. On 8/25/2021, this loan, including accrued interest, totaling $1,014,374, was forgiven. Diego Hills Public Charter, Inc. operates on a fiscal year that begins on July 1 and ends on June 30.

27.    Desert Sands Public Charter Education, Inc., with an address listed on their SBA loan application of 177 Holston Dr., Lancaster, CA 93535-4570, received PPP loan #4349707407 on 5/8/2020 in the amount of $2,376,182. On 8/9/2021, this loan, including accrued interest, totaling $2,405,412, was forgiven. Desert Sands Public Charter Education, Inc. operates on a fiscal year that begins on July 1 and ends on June 30.

28.    Mission View Public Charter, Inc., with an address listed on their SBA loan application of 177 Holston Dr., Lancaster, CA 93535-4570, received PPP loan #6682667204 on 4/28/2020 in the amount of $393,797. On 6/11/2021, this loan, including accrued interest, totaling $398,059, was forgiven. Mission View Public Charter, Inc. operates on a fiscal year that begins on July 1 and ends on June 30.

29.    Sierra Educational Advancement Corporation, with an address listed on their SBA loan application of 177 Holston Dr., Lancaster, CA 93535-4570, received PPP loan #6783957207 on 4/28/2020 in the amount of $444,500. On 6/11/2021, this loan, including accrued interest, totaling

$449,347, was forgiven. Sierra Educational Advancement Corporation operates on a fiscal year that begins on July 1 and ends on June 30.

30. Vista Real Public Charter, Inc., with an address listed on their SBA loan application of 177 Holston Dr., Lancaster, CA 93535-4570, received PPP loan #6462807207 on 4/28/2020 in the amount of $2,378,560. On 8/30/2021, this loan, including accrued interest, totaling $2,409,579, was forgiven. Vista Real Public Charter, Inc. operates on a fiscal year that begins on July 1 and ends on June 30.

31. Western Educational Corporation, with an address listed on their SBA loan application of 177 Holston Dr., Lancaster, CA 93535-4570, received PPP loan #2555017109 on 4/10/2020 in the amount of $6,186,000. On 7/29/2021, this loan, including accrued interest, totaling $6,263,113, was forgiven. Western Educational Corporation operates on a fiscal year that begins on July 1 and ends on June 30.

## IV.   LEGAL AND REGULATORY FRAMEWORK

### A.   Overview of the False Claims Act, as Applicable to This Complaint

32. Originally enacted in the 1860s to combat fraud against the Union Army during the Civil War, the False Claims Act is the primary tool with which the United States combats false or fraudulent claims against the government and protects federal funds.

33. The False Claims Act provides that a person is liable to the United States Government for each instance in which the person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A).[5]

---

[5] While the submission of false or fraudulent claims to the Government for payment is the primary act punishable under the FCA, the Act also prohibits similar fraudulent conduct, including making false records or statements material to a false claim, § 3729(a)(1)(B), conspiring to violate the FCA, § 3729(a)(1)(C), and others, § 3729(a)(1)(D)-(G).

COMPLAINT

9

34.    The False Claims Act also makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

35.    The False Claims Act also contains a "reverse false claim" provision, which makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).  The term obligation includes "the retention of any overpayment." *Id.* § 3729(b)(3).  Generally speaking, an "overpayment" means any funds that a person or entity receives or retains to which that person or entity is not entitled.  42 U.S.C. § 1320a–7k(d)(4)(B).

36.    The False Claims Act defines "knowingly" to mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). The False Claims Act provides that no proof of specific intent to defraud is required.  31 U.S.C. § 3729(b)(1)(B).

37.    The False Claims Act defines the term "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

38.    The False Claims Act defines the term "claim" to mean, in relevant part: "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government – (I) provides or has provided any portion of the money or property

requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

39.    The Supreme Court has held that the False Claims Act's provisions must be construed broadly to reach "all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). A request for payment made under a federal loan guarantee that was obtained in violation of a statute, regulation, or program requirement, by the use of a false statement or by means of other fraudulent conduct, qualifies as a "claim" under the False Claims Act. *Id.* at 232-33 (noting that the term "claim" is not limited to legally enforceable claims but includes all fraudulent attempts to cause government to pay out money).

40.    The False Claims Act is an "expansive" statute, reaching "all types of fraud, without qualification, that might result in financial loss to the Government." *Cook County., Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (quoting *Neifert-White Co.*, 390 U.S. at 232).

41.    Any person who violates the False Claims Act "is liable to the United States Government for a civil penalty of not less than [$13,508] and not more than [$27,018], plus three times the amount of the damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1) (emphasis added); 28 C.F.R. § 85.5(a); Pub. L. No. 101-410.[6]

42.    The provisions of the FCA can be enforced by the DOJ, which is empowered to bring actions of its own accord (*see* § 3730(a)), but the FCA also allows private individuals with knowledge of fraud to bring a suit on behalf of the government. § 3730(b)(1). These whistleblowers are known as *qui tam* relators.

43.    Relators are an important means of unearthing fraud on the Government. The United States Department of Justice has estimated that government fraud drains as much as 10% of the total federal budget but noted that "most fraud goes undetected."[7] Whistleblower actions by private

---

[6] The exact amount of civil penalties actually increases over the years because they are subject to adjustment under the Federal Civil Penalties Inflation Adjustment Act of 1990. § 3729(a)(1) (citing Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, § 5, 104 Stat. 890).

relators account for 64% of all successful FCA recoveries by the Government.[8] Without the assistance of these whistleblowers, the majority of fraud against public assets would go unaddressed. Wherever there is a significant investment of public assets, whistleblower programs like the FCA are necessary to ensure that those assets are used efficiently.

44. To encourage relators to come forward and bring to light allegations of fraud that they are aware of, the FCA entitles relators to a portion of any monetary recovery obtained in a *qui tam* case. § 3730(d)(1), (2). In cases in which the Government intervenes, the relator's share typically ranges from 15-25% of the total recovery, with the precise amount determined based on, *inter alia*, the relator's specific contributions to the action and whether the Government intervenes to pursue the claim.[9] Given the large recoveries under the FCA's treble damages regime, the relator's share serves as a powerful incentive for would-be whistleblowers. The Act also provides whistleblower-relators an individual cause of action if they suffer workplace retaliation because of their whistleblower activities.[10]

## B. The SBA Paycheck Protection Program

### 1. SBA Loan Programs in General

45. Created in 1953, the mission of the United States Small Business Administration is to help small business owners and entrepreneurs pursue the American dream. The SBA is a cabinet-level agency of the United States. It is fully dedicated to small businesses and provides counseling, capital, and contracting expertise as the nation's only go-to resource and voice for small businesses.

---

[7] S. Rep. No. 99-345, at 2 (1986), as reprinted in 1986 U.S.C.C.A.N. 5266, 5268.

[8] U.S. Gov't Accountability Off., Information on False Claims Act Litigation 5 (2006), https://www.gao.gov/new.items/d06320r.pdf.

[9] Under § 3730(d)(1), if the Government intervenes, the relator is entitled to "receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action." If the Government declines to intervene, the relator can receive an even larger share, between 25 percent and 30 percent of the case proceeds. § 3730(d)(2). If the Court finds that the relator planned and initiated false claims, they may be dismissed from the action and will receive no share of the recovery. § 3730(d)(3).

[10] § 3730(h).

46.    The SBA works with lenders to provide loans to small businesses.  The SBA doesn't lend money directly to small business owners.  Instead, it sets guidelines for loans made by its partnering lenders, community development organizations, and micro-lending institutions.

47.    Loans guaranteed by the SBA range from small to large and can be used for most business purposes, including long-term fixed assets and operating capital.  Certain loan programs set restrictions on how businesses can use the funds.

48.    Additionally, SBA loan programs have unique eligibility requirements.  In general, eligibility is based on what a business does to receive its income, the character of its ownership, and where the business operates.  Qualified businesses must meet size standards, be able to repay, and have a sound business purpose.

**2.    The Paycheck Protection Program - PPP**

49.    The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in March, 2020 to provide financial assistance to Americans suffering economic harm resulting from the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses, which would facilitate employee retention through the maintenance of payroll, despite drastic reductions in company revenue and possible worker "layoffs" and certain other expenses. This was accomplished through a program referred to as the Paycheck Protection Program (PPP).

50.    To obtain a PPP loan, a qualifying business submitted a PPP loan application which was signed by an authorized representative of the business.  The PPP loan application required the business (through its authorized representative) to acknowledge the PPP program's rules, and to make certain affirmative certifications in order to receive the PPP loan, including representations that the business was in operation on February 15, 2020.  The business was also required to provide, among other things, its (a) average monthly payroll expenses and (b) number of employees. These figures were used to determine eligibility and to calculate the amount of money the business was eligible to receive

under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation of their payroll expenses.

51.    The CARES Act required PPP loan applications to be processed by a participating lender. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were guaranteed by the Small Business Administration ("SBA"). Data from the application, including information about the borrower, the total amount of the loan, the listed number of employees and the volume of the business, were transmitted by the lender to the SBA, which then relied on those representations in processing the loan.

52.    PPP loan proceeds were required to be used by the business for certain permissible expenses such as payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on eligible expense items within a designated period, and used a defined portion of the PPP loan proceeds on payroll expenses.

**3.    Laws, Regulations, and Guidance for the PPP**

53.    On March 27, 2020, the President signed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") (Pub. L. 116-136) to provide emergency assistance and health care response for individuals, families, and businesses affected by the coronavirus pandemic. The SBA received funding and authority through the CARES Act to modify existing loan programs and establish a new loan program to assist small businesses nationwide adversely impacted by the COVID-19 emergency.

54.    Section 1102 of the Act temporarily permits SBA to guarantee 100 percent of 7(a) loans under a new program titled the Paycheck Protection Program ("PPP"). Section 1106 of the Act provides for forgiveness of up to the full principal amount of qualifying loans guaranteed under the PPP.

55.     Title I of the CARES Act established PPP under a new Section, 7(a)(36) of the Small Business Act of 1953 (the "Small Business Act").  PPP was subsequently expanded by the Paycheck Protection Program and Health Care Enhancement Act, which was signed into law on April 24, 2020, and extended by the Paycheck Protection Program Flexibility Act (the "Flexibility Act"), which was signed into law on June 5, 2020.

56.     The SBA and the United States Department of the Treasury ("Treasury") worked together to implement PPP, releasing regulations and guidance on a regular basis.

57.     Loans issued by lenders under the PPP were 100 percent guaranteed by SBA, and the full principal amount of the loans could qualify for loan forgiveness.

58.     Because PPP is a loan program under Section 7(a) of the Small Business Act, it is subject to the regulations applicable to SBA Section 7(a) business loans except when the CARES Act or applicable regulations provide otherwise.

59.     Section 7(a) loan regulations are generally found in 13 C.F.R. part 120.  PPP is also subject to the SBA "affiliation" rules, located at 13 C.F.R. § 121.301(f).

60.     In addition to the laws and regulations that apply to PPP loans, beginning in April 2020, the SBA has on numerous occasions issued ongoing official guidance regarding PPP loans.  Two of the primary mechanisms used by the SBA to provide this guidance are interim final rules ("IFRs") and public answers to frequently asked questions ("SBA FAQs").  Specific guidance relevant to these actions are discussed below.

61.     SBA published its Interim Final Rule on Business Loan Program Temporary Changes; Paycheck Protection Program ("IFR #1") on April 2, 2020. Thereafter, it issued numerous additional IFRs, including IFRs issued on April 3, 2020 ("IFR #2," Applicable Affiliation Rules); April 28, 2020 ("IFR #4," Promissory Notes, Authorizations, Affiliation, and Eligibility); April 30, 2020 ("IFR #7," Corporate Groups and Non-Bank and Non-Insured Depository Institution Lenders); May 8, 2020 ("IFR #9," Extension of Limited Safe Harbor with Respect to Certification Concerning Need for

PPP Loan Request); May 20, 2020 ("IFR #13," Second Extension of Limited Safe Harbor with Respect to Certification Concerning Need for PPP Loan and Lender Reporting); May 22, 2020 ("IFR #14," Loan Forgiveness; and "IFR #15," SBA Loan Review Procedures and Related Borrower and Lender Responsibilities); June 11, 2020 ("IFR #17," Revisions to First Interim Final Rule[11]); June 22, 2020 ("IFR #20," Revisions to Loan Forgiveness Interim Final Rule and SBA Loan Review Procedures Interim Final Rule[12]). Each of these IFRs can be found on the SBA's website, at https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/ppp-lender-information#id-interim-final-rules.

62.     Between April 6, 2020, and June 13, 2023, the SBA published answers to questions about the PPP program on twenty-five occasions.[13] These regularly updated question-and-answer documents (the "SBA FAQ") are posted on the SBA and Treasury websites. The first version of the SBA FAQ was published on April 6, 2020, and included answers to 18 questions. By the end of April 2020, the SBA would release 7 additional versions of its AFAQ, which by April 29, 2020 (version 8) had expanded to 39 questions. The most recent version (version 25) was released on June 13, 2023, and included answers to 72 questions.

**4.      PPP Loan Eligibility**

63.     A business was eligible for a First Draw PPP loan if it met any one of the following standards:

---

[11] IFR #17 revised IFR #1 to account for changes made by the Flexibility Act, which was signed into law in June 2020.

[12] IFR #20 revised IFR #14 and IFR #15 to account for changes made by the Flexibility Act.

[13] *See* https://www.sba.gov/document/support-faq-ppp-borrowers-lenders. Later versions generally included the questions from earlier versions, updating answers as needed, or if no updates were necessary, reprinting the original answers. Throughout this Complaint, Relator cites to the final Q&A version (version 25, published June 13, 2023, *available at* https://www.sba.gov/sites/default/files/2023-03/Paycheck-Protection-Program-Frequently-Asked-Questions_05%2013%2020.pdf), except where it is necessary to cite to earlier versions containing information that was later changed. Where appropriate, Relator provides information about the date on which the information in the Q&A was originally published by the SBA.

i.      Together with its affiliates, it has 500 or fewer employees, regardless of their principal place of residence. *See* 15 U.S.C. § 636(a)(36)(D)(i)(I); SBA FAQ Question 44 (published May 13, 2020).

ii.     Together with its affiliates, it meets the SBA (employee-based or receipts-based) size standard for the North American Industry Classification System ("NAICS") code applicable to its primary industry.[14] *See* 15 U.S.C. § 636(a)(36)(D)(i)(II); SBA FAQ Question 3 (published April 6, 2020).

iii.    Its primary industry is in NAICS category 72 (accommodations and food service), and it has, together with its affiliates, no more than 500 employees per physical location. *See* 15 U.S.C. § 636(a)(36)(D)(iii)(I).

iv.     On its own (i.e., regardless of its affiliates), it meets the size standard (employee-based or receipts-based) established by SBA for the NAICS code applicable to its primary industry, and together with its affiliates, it meets the size standard (employee-based or receipts-based) established by SBA for the NAICS code applicable to either its primary industry or the primary industry of itself and its affiliates on a combined basis, whichever standard is higher. *See* 13 C.F.R. § 121.301(a); SBA FAQ Question 2 (published April 6, 2020).

v.      Housing cooperatives, eligible 501(c)(6) organizations, and eligible destination marketing organizations are eligible for a First Draw PPP Loan only if they employ no more than 300 employees.

vi.     It has, together with its affiliates, $15 million or less of tangible net worth as of March 27, 2020, and $5 million or less of average net income after Federal income taxes (excluding carry-over losses) for the last two full fiscal years

---

[14] SBA size standards based on industry codes are found in 13 C.F.R. § 121.201. https://www.ecfr.gov/on/2020-04-15/title-13/chapter-I/part-121

COMPLAINT
17

before the date of application. *See* 15 U.S.C. § 632(a)(5)(B); SBA FAQ Question 2 (published April 6, 2020).

64.    In counting employees for purposes of determining PPP eligibility, PPP applicants may use (a) their average number of employees over the previous 12 months, (b) their average number of employees for calendar year 2019, or (c) their average number of employees for each pay period during the last 12 calendar months completed prior to the loan application.  If the business has been operational for less than 12 months, it may use the average number of employees for each of the pay periods that it has been operational. *See* 13 C.F.R. § 121.106(b); SBA FAQ Question 14 (published April 6, 2020).  In order to meet the eligibility test of what constitutes an "employee" for PPP loan qualification, , an expansive  head-count test is used, which includes full-time, part-time, temporary, leased, and furloughed employees of the applicant small business. *See* 13 C.F.R. § 121.106(a).

65.    Of critical importance here the SBA notes that "all borrowers should carefully review the required certification on the Paycheck Protection Program Borrower Application Form (SBA Form 2483), stating that "current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.'" *See* IFR #4 § 2(b).

66.    SBA guidance further provides (*id*) that "Borrowers must make this certification in good faith, taking into account their current business activity and their ability to access other sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business."  See SBA FAQ Question 31 (published April 23, 2020).

67.    Unlike other SBA loans, which are available only to borrowers who are unable to obtain credit from sources other than the SBA, the CARES Act waived the "credit not available elsewhere" requirement for PPP loans. *See* 15 U.S.C. § 636(a)(36)(I). Thus, an applicant is not specifically required to show that it is unable to obtain credit elsewhere in order to get a PPP loan.

68.    Nonetheless, PPP borrowers must still certify that the PPP loan is necessary as part of the loan application, and SBA FAQ Question 31 (published on April 23, 2020)

69.    For applicants that applied for and received a PPP loan but then believed, based on subsequent SBA guidance, that they could not certify in good faith that current economic uncertainty makes their PPP loan necessary to support ongoing operations, the SBA provided a safe harbor that permitted borrowers to repay PPP loans in full by May 18, 2020. *See* IFR #4 § 5, as modified by IFR #9 and IFR #13 § 1.[15] *See also* SBA FAQ Question 31, as modified by SBA FAQ Question 43 (published May 5, 2020) and SBA FAQ Question 47 (published May 13, 2020).

70.    Further, concerning this "safe harbor provision, the SBA stated that: "Any borrower that, *together with its affiliates*, received PPP loans with an original principal amount of less than $2 million will be deemed to have made the required certification concerning the necessity of the loan request in good faith." Affiliation for this purpose is determined based on the rules that apply for determining eligibility for a PPP loan.  *See* SBA FAQ Question 46 (published May 13, 2020).[16]

71.    The SBA defines "affiliation" as one business controlling or having the power to control another or when a third party (or parties) controls or has the power to control both businesses. S*ee* 13 C.F.R. § 121.301(f); Affiliation Guidance.  The SBA has an expansive view of what constitutes "control," and it does not matter whether control is exercised so long as the power to control exists. SBA applies four specific affiliation rules[17] for purposes of the PPP size tests:

      a.    *Affiliation based on ownership*.  For determining affiliation based on equity ownership, a concern is an affiliate of an individual, concern, or entity that

---

[15] The original safe harbor deadline was May 7, 2020, but that was subsequently extended through IFR #9 and IFR #13 to May 18.

[16] https://www.sba.gov/sites/default/files/2023-03/Paycheck-Protection-Program-Frequently-Asked-Questions_05%2013%2020_2.pdf. Question 46 was first published on May 13, 2020 and then revised twice in March 2021, before eventually being deleted from the FAQ in July 2021, after SBA discontinued the loan necessity questionnaire.

[17] Affiliation Rules Applicable To U.S. Small Business Administration Paycheck Protection Program https://home.treasury.gov/system/files/136/Affiliation%20rules%20overview%20%28for%20public%29.pdf

owns or has the power to control more than 50% of the concern's voting equity. If no individual, concern, or entity is found to control, SBA will deem the board of directors or president or chief executive officer (or other officers, managing members, or partners who control the management of the concern) to be in control of the concern. SBA will deem a minority shareholder to be in control if that individual or entity has the ability, under the concern's charter, bylaws, or shareholder's agreement, to prevent a quorum or otherwise block action by the board of directors or shareholders. *See* 13 C.F.R. § 121.301(f)(1).

b. *Affiliation arising under stock options, convertible securities, and agreements to merge.* For purposes of determining control and affiliation, options, convertible securities, and agreements to merge (including agreements in principle) are considered effective as if exercised or consummated, as the case may be, unless subject to conditions precedent which are incapable of fulfillment, speculative, conjectural, or unenforceable under state or Federal law, or where the probability of the transaction (or exercise of the rights) occurring is shown to be extremely remote. Significantly, a person or entity that controls one or more other entities cannot use options, convertible securities, or agreements to appear to eliminate control before actually doing so. SBA will not give present effect to a person's or entity's ability to divest all or part of its ownership interest in order to avoid a finding of affiliation. *See* 13 C.F.R. § 121.301(f)(2).

c. *Affiliation based on management.* Where the chief executive officer or president of an entity (or other officers, managing members, or partners who

control the management of the entity) also controls the management of another entity, the two entities will be deemed affiliates under common control. Where a single person or entity that controls the board of directors or management of one entity also controls the board of directors or management of another entity, the two entities will be deemed affiliates under common control. Where a person or entity controls the management of another entity through a management agreement, the entities are deemed affiliated. S*ee* 13 C.F.R. § 121.301(f)(3).

d. *Affiliation based on identity of interest.* Where there is an identity of interest between close relatives with identical or substantially identical business or economic interests (e.g., in the same or similar industry in the same geographic area), such interests are presumed to be affiliated. This presumption may be rebutted with evidence showing that the interests are separate. S*ee* 13 C.F.R. § 121.301(f)(4).

72.   The affiliation based on management criterion (rule c. above) is particularly relevant here, since where management of an entity is deemed to be an affiliate of a PPP applicant, all other affiliates of that manager (e.g., all other companies managed by the manager) shall be deemed affiliates of that PPP applicant.

73.   Moreover, if the company is part of a family or series of companies under common management control, the affiliates of those entities would also be deemed affiliates of the PPP applicant. In many cases, such extended affiliation would make it impossible for the applicant to meet the size standards for PPP eligibility. *id*

74.   In addition, management companies are deemed affiliates of the companies they manage by virtue of common management or common control, which renders them affiliates of the companies they manage and excludes that entire group of companies from PPP eligibility.  In any of these situations, a PPP applicant must account for affiliates in size determinations. Plaintiff contends that these rules were disqualifying under the fact pattern pled here but were nonetheless conveniently overlooked when the certifications at issue were made and signed.

75.   There are certain circumstances in which the affiliation rules do not apply.  See 15 USCS § 636(a)(36)(D)(iv). Specifically, the CARES Act waives the affiliation rules with respect to the eligibility of a PPP applicant that is one of the following:

i.  A business within NAICS category 72 that has no more than 500 employees.

ii.  A franchise with a franchise identifier code assigned by SBA in the SBA Franchise Directory.

iii.  A business that receives financial assistance from a small business investment company licensed by SBA ("SBIC").

76.   A company controlled by a management company may qualify for a PPP loan using the tangible net worth and net income test (described above), assuming the company and its affiliates, which would include the management company's other controlled companies, meet the tangible net worth and net income tests on a combined basis, or in the alternative, it meets the size standard (employee-based or receipts-based) established by SBA for the NAICS code applicable to either its primary industry or the primary industry of itself and its affiliates on a combined basis.

5.   **PPP Loan Terms**

77.   PPP loans funded before the enactment of the Flexibility Act mature two years from the date of funding, see Interim Final Rule § 2(j), unless modified by the lender and borrower, see Flexibility Act § 2(b).  PPP loans funded after the enactment of the Flexibility Act on June 5, 2020,

mature five years after the date of funding.  See Small Business Act § 7(a)(36)(K)(ii), as amended by Flexibility Act § 2.

78.    No payments are due on a PPP loan until the SBA has paid the lender the amount of the PPP loan to be forgiven or notified the lender that no forgiveness will be allowed, but interest will accrue during that period.  *See* 15 U.S.C. § 636(a)(36)(M)(ii), as amended by Flexibility Act § 3(c); Interim Final Rule § 2(n), as revised by IFR #17 § 1(c).

79.    Thereafter, most banks will charge monthly or quarterly payments of principal and interest until maturity.  However, any borrower that does not apply for forgiveness within ten months after the end of its eight-week or 24-week covered period must begin making payments of principal and interest on or after the expiration of that ten-month period.  *See* 15 U.S.C. § 636(a)(36)(M)(v), as amended by Flexibility Act § 3(c).

80.    Lenders must notify borrowers when SBA pays the forgiveness amount or determines that no forgiveness is allowed.  *See* Interim Final Rule § 2(n), as revised by IFR #17 § 1(c).

**6.    The PPP Loan Application and Required Certifications**

81.    The PPP Loan Application form requires the applicant to certify its number of employees.

82.    The PPP Loan Application form also requires the applicant to identify all of its "owners," defining that term to mean any member owning 20% or more of the equity of the applicant.

83.    The loan application requires an express certification that the applicant "has read the statements included in this form, including the Statements Required by Law and Executive Orders, and I understand them."

84.    The loan application also requires an express certification that "[t]he applicant is eligible to receive a loan under the rules in effect at the time this application is submitted, that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection

Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule)."

85.    The loan application also requires an express certification that the applicant "employs no more than the greater of 500 or employees or, if applicable, the size standard (employee-based or receipts-based) established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry."

86.    The loan application also requires an express certification that "[a]ll SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule."

87.    The loan application also requires the applicant to expressly certify that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."

88.    The loan application also requires the applicant to expressly certify that "[t]he funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud."

89.    The loan application also requires the applicant to expressly certify that "the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects" and that "[the applicant] understand[s] that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000."

COMPLAINT
24

90.    The loan application also requires the applicant to expressly certify that "[the applicant] acknowledge[s] that the lender will confirm the eligible loan amount using required documents submitted."

91.    The loan application requires an authorized representative of the applicant to sign.

92.    As noted, at least with respect to larger companies and businesses owned by private companies with adequate sources of liquidity, the SBA has indicated that applicants must take into account "their current business activity and their ability to access other sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business." *See* SBA FAQ Questions 31 (published April 23, 2020) and 37 (published April 29, 2020). Accordingly, in making the express certification, applicants are required to consider their need for PPP funding in light of SBA FAQ Question 31, stated above.

93.    Absent the applicable express certifications for a PPP loan as described above, the applicant is not eligible to receive PPP loan funds and the lender cannot approve the loan for PPP funds.

94.    Each of the foregoing PPP loan application certifications is a material condition to SBAs approval and payment of any claim submitted under the PPP.  SBA does not review PPP loan applications for approval prior to the loan funds being disbursed; instead, it relies on its lenders to comply with SBA requirements and to ensure that every loan is in fact eligible for the PPP.  The certifications are required for approval of the PPP loan application and for each applicant to receive payment of PPP loan funds.  The certifications are critical to SBA's and the United States' ability to ensure that only qualified and eligible loans are approved and paid.  And the certifications are needed to protect SBA and the United States from undue risk and loss.

95.    The SBA permitted any borrower that received a PPP loan and believed upon reconsideration that it could not make the required certification in light of SBA's guidance to repay the

PPP loan in full by May 18, 2020. According to the SBA, it would deem any borrower that repaid by May 18, 2020, to have made the required certification of need in good faith. *See* IFR #4 § III(5) as modified by IFR #9 § III and IFR #13 § III(1); SBA FAQ Question 31 (published April 23, 2020), as modified by SBA FAQ Question 43 (published May 5, 2020) and SBA FAQ Question 47 (published May 13, 2020).

96. On May 13, 2020, the SBA published FAQ Question and Answer 46 ("FAQ 46"), which provides a new safe harbor based on the principal amount of PPP loans received by a borrower and its affiliates: "Any borrower that, together with its affiliates, received PPP loans with an original principal amount of less than $2 million will be deemed to have made the required certification concerning the necessity of the loan request in good faith." (Affiliation for this purpose is determined based on the rules that apply for determining eligibility for a PPP loan, as announced in IFR #2.)

97. FAQ 46 also gives PPP borrowers with loans greater than $2 million that do not satisfy the new safe harbor a means to limit their exposure to sanctions from the SBA. If the SBA determines that such a borrower did not have an adequate basis for the certification of need, SBA will notify the borrower and seek repayment in full of the PPP loan and tell the lender that the borrower is not eligible for loan forgiveness. FAQ 46 provides that SBA will not pursue further administrative enforcement or refer the borrower to other governmental agencies based on its determination regarding the certification of need if the borrower repays the loan in full after receiving notification from SBA. *See* SBA FAQ Question 46 (published May 13, 2020).

98. Notably, repaying the loan pursuant to FAQ 46 does not shield the borrower from all potential liability. FAQ 46 merely states that SBA will not pursue additional action based on a determination that the borrower lacked an adequate basis for the certification of need. A borrower is still liable if there are other violations of the PPP statute or implementing regulations. Further, nothing in FAQ 46 prevents the Government or a *qui tam* relator or whistleblower who believes that the

COMPLAINT
26

borrower knowingly made a false statement in connection with its PPP loan application from bringing a complaint under the False Claims Act.

**V.    LIFELONG LEARNING ADMINISTRATION CORPORATION's False and Fraudulent Claims Surrounding Its Application for, Receipt of, and Failure to Repay PPP Funds**

**A.    Lifelong Learning Administration Corporation Falsely Certified the Necessity of Its PPP    Loan**

As noted above with citations, applicants for PPP funds must make several express certifications when applying for loans and loan forgiveness.  One of those express certifications is that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."  The borrower certification requirement of "necessity" is found in the CARES Act." 15 U.S.C. § 636(a)(36)(G).

99.    Because the SBA requires an express certification of necessity to determine eligibility and thoroughly discussed the certification in guidance, a false certification of necessity is a materially false misrepresentation which would necessarily influence the SBA's decision to approve a PPP loan.

100.    The SBA notes that "all borrowers should carefully review the required certification on the Paycheck Protection Program Borrower Application Form (SBA Form 2483) stating that '[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.'" *See* IFR #4 § III(2)(b).

101.    SBA FAQ 31 (published April 23, 2020) explains that applicants making the PPP loan certification should "tak[e] into account their current business activity and their ability to access other sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business."

102.    SBA FAQ Question 37 extends SBA FAQ Question 31 to all businesses owned by private companies with adequate sources of liquidity.  *See* SBA FAQ Question 37 (published April 29, 2020).

103. Despite the fact that the PPP was intended for small businesses, many apparently large businesses, such as Lifelong Learning Administration Corporation, claimed PPP funds, while falsely making the necessity certification.

104. Lifelong Learning Administration Corporation falsely certified in its application that a PPP loan was "necessary" to support its ongoing operations.

105. Lifelong Learning Administration Corporation made the necessity certification without taking into account other sources of liquidity to support its operations, and without taking into account whether the PPP funds were genuinely needed to cover the allowed expenses.

106. Additionally, upon information and belief, Lifelong Learning Administration Corporation's other affiliated companies— Antelope Valley Learning Academy Inc., Alta Vista Public Charter, Inc., Crescent View South Inc., Crescent View West Public Charter Inc., Desert Sands Public Charter, Inc., Diego Plus Education Corporation, Mission View Public Charter Inc., Sierra Educational Advancement Corporation, Vista Real Public Charter, Inc., and Western Educational Corporation —also falsely certified in their applications that a PPP loan was "necessary" to support their ongoing operations.

107. The Defendant, Lifelong Learning Administration Corporation ("Lifelong"), receives generous annual management and consulting fees from the ten other affiliated Defendants named in this Complaint. Lifelong suffered no disruption to its revenue during the COVID-19 pandemic, and it actually received higher revenue in 2020, the year of submitting its PPP Application, than in the previous year. Lifelong Learning Administration Corporation's revenue was $44,274,182 for the tax year ending 06/30/2019 and $52,363,028 for the tax year ending 06/30/2020, an increase of 18.26%. When applying for PPP loan(s) and PPP loan forgiveness, Lifelong and their affiliates knew that PPP loans were unnecessary and that they therefore did not qualify to receive them; that they and their affiliates' entire operations were adequately funded during all relevant periods by alternate sources of liquidity, rendering access to PPP funds unnecessary.

108. Defendants, Antelope Valley Learning Academy Inc., Alta Vista Public Charter, Inc., Crescent View South Inc., Crescent View West Public Charter Inc., Desert Sands Public Charter, Inc., Diego Plus Education Corporation, Mission View Public Charter Inc., Sierra Educational Advancement Corporation, Vista Real Public Charter, Inc., and Western Educational Corporation, and each of them, receive their annual funding from The California Department of Education and through other governmental grants. Each defendant listed hereabove has stated on their Federal Income tax filings that: "*the organization's schools are **completely funded** by a local governmental agency control funding formula according to enrollment (average daily attendance) and paid from the state of California, a governmental entity.*"[18] There was no actual or reasonably anticipated disruption to these entities' ongoing governmental funding, and in fact, they generally received more funding during the early COVID-19 pandemic period than in relevant prior years (see ¶ 109, *infra*).

109. Antelope Valley Learning Academy, Inc.'s revenue was $84,982,752 for the tax year ending 06/30/2019 and $85,549,547 for the tax year ending 06/30/2020, an increase of 0.67%. Alta Vista Public Charter, Inc.'s revenue was $7,424,069 for the tax year ending 06/30/2019 and $16,689,542 for the tax year ending 06/30/2020, an increase of 124.80%. Crescent View South, Inc.'s revenue was $27,711,421 for the tax year ending 06/30/2019 and $34,842,332 for the tax year ending 06/30/2020, an increase of 25.73%. Crescent View West Public Charter Inc.'s revenue was $23,359,667 for the tax year ending 06/30/2019 and $25,852,328 for the tax year ending 06/30/2020, an increase of 10.67%. Diego Hills Public Charter, Inc.'s revenue was $18,856,608 for the tax year ending 06/30/2019 and $13,692,215 for the tax year ending 06/30/2020, a decrease of 27.39%. Desert Sands Public Charter Education, Inc.'s revenue was $29,612,158 for the tax year ending 06/30/2019 and $28,520,536 for the tax year ending 06/30/2020, a decrease of 3.69%. Mission View Public Charter, Inc.'s revenue was $4,441,966 for the tax year ending 06/30/2019 and $3,893,531 for the tax year ending 06/30/2020, a decrease of 12.35%. Sierra Educational Advancement Corporation's revenue was

---

[18] (For the 2018 calendar year, or tax year beginning 07-01-2018 and ending 06-30-2019), form 990, SCHEDULE E - Schools - Part II, page 2, Line 6 - Explanation of Aid or Assistance from Governmental Agency:

$5,060,089 for the tax year ending 06/30/2019 and $5,700,199 for the tax year ending 06/30/2020, an increase of 12.65%. Vista Real Public Charter, Inc.'s revenue was $28,934,779 for the tax year ending 06/30/2019 and $36,082,156 for the tax year ending 06/30/2020, an increase of 24.70%. Western Educational Corporation's revenue was $58,179,886 for the tax year ending 06/30/2019 and $65,815,539 for the tax year ending 06/30/2020, an increase of 13.12%. The combined affiliates' revenue was $332,837,577 for the tax year ending 06/30/2019 and $369,000,953 for the tax year ending 06/30/2020, an overall increase of 10.87%, sourced entirely "*by a local governmental agency control funding formula according to enrollment (average daily attendance) and **paid from the state of California**, (underscore and bold emphases supplied).*

110. When applying for PPP loans and PPP loan forgiveness, these defendants knew that the PPP loans applied for were unnecessary for their economic survival relative to the Coronavirus pandemic, and that they did not qualify under SBA rules and standards cited herein to receive them.

111. The false certifications and representations made by Lifelong Learning Administration Corporation and its affiliate companies regarding the necessity of PPP funds for its ongoing operations were relied upon by the Government, which fact allowed Lifelong Learning Administration Corporation and their affiliate entities to obtain PPP funds to which they were not entitled, and to avoid repaying those funds, despite being not entitled to loan forgiveness.

112. Lifelong Learning Administration Corporation and their affiliates' false certification of necessity was material because that certification impacted their eligibility for PPP loan funding and the SBA's decision to approve the loan, and thereafter to justify loan forgiveness.

**B.   Lifelong Learning Administration Corporation Falsely Certified Compliance with the PPP Size and Affiliation Rules**

**i. PPP Size and Affiliation Rules (¶¶ 113 – 116)**

113. The CARES Act expressly limits PPP loans to businesses with fewer than 500 employees, or those otherwise qualifying as a small business concern under other SBA standards, with

certain limited exceptions, recited above, mentioned in ¶¶ 114 and 155 directly below, and not operative here.

114. For example, on its own (i.e., regardless of its affiliates), it meets the size standard (employee-based or receipts-based) established by SBA for the NAICS code applicable to its primary industry, and together with its affiliates, it meets the size standard (employee-based or receipts-based) established by SBA for the NAICS code applicable to either its primary industry or the primary industry of itself and its affiliates on a combined basis, whichever standard is higher.

115. The "alternative size standard" for PPP loans also allows businesses to qualify if, as of March 27, 2020, the maximum tangible net worth of the business is not more than $15 million, and their average net income after federal income taxes for the two full fiscal years before the date of the application was not more than $5 million.

116. Businesses must include the employees of affiliate businesses in their size determinations, according to the SBA's affiliation rules. *See* 13 C.F.R. § 121.301(f); Affiliation Guidance.

**ii. Facts Supporting Affiliation Among Defendants (¶¶ 117 – 129)**

117. Lifelong Learning Administration Corporation is an affiliate of the other defendants because, *inter alia*, it exerts management control over the other defendant companies. Conversely, the other named Defendants are affiliates of Lifelong Learning Administration Corporation under the SBA and PPP rules and guidelines, for much that same factual reason.

118. Upon information and belief, Lifelong Learning Administration Corporation is the manager of and controls or has the power to control its other affiliated defendant companies, including but not limited to: Antelope Valley Learning Academy Inc., Alta Vista Public Charter, Inc., Crescent View South Inc., Crescent View West Public Charter Inc., Desert Sands Public Charter, Inc., Diego Plus Education Corporation, Mission View Public Charter Inc., Sierra Educational Advancement Corporation, Vista Real Public Charter, Inc., and Western Educational Corporation. Accordingly,

Lifelong Learning Administration Corporation is an affiliate of each of these other defendant companies, and, in turn, the other companies are affiliates of Lifelong Learning Administration Corporation for purposes of the PPP size and net-worth tests. *See* 13 C.F.R. § 121.301(f); Affiliation Guidance.

119. Lifelong Learning Administration Corporation **owns the trademarks for the following affiliated companies:** Kings Valley II Academy, Marconi Learning Academy, Crescent View South II Charter School, Jobs 4 California Graduates J4CG, Vista Norte Public Charter School, Crescent Valley II Public Charter School, Ambassador Sanchez II Public Charter School, Crescent View West Public Charter School, AV Learning Academy, Assurance Learning Academy, Desert Sands Charter School, Diego Hills Central Public Charter School, Diego Valley East Public Charter School, Mission View Public Charter School, LL Lifelong Learning, FlexHigh Change Your Story, Learn4life Change Your Story, Prints4life, Flex High A Blended High School, Kings Valley Academy, Diego Springs Academy, Learn4life Changes Lives One Student at A Time and Learn4life.[19] Lifelong's ownership of the affiliated Co-Defendant's trademarks demonstrates management control over these affiliates.

120. The affiliated entities share Officers and Directors who manage the affiliated companies. In 2018 and 2019, Jeff Brown was the Senior Executive of Lifelong Learning Administrative Corp. Beginning in 2020 through to date; Jeff Brown is the CEO of nine of the other managed and affiliated defendant companies: Antelope Valley Learning Academy Inc.; Alta Vista Public Charter Inc.; Crescent View South Inc.; Crescent View West Public Charter Inc.; Desert Sands Public Charter, Inc.; Diego Plus Education Corporation; Mission View Public Charter, Inc.; Sierra Educational Advancement; and Western Educational Corporation.[20]

---

[19] https://opencorporates.com/companies/us_ca/3823625/statements/trademark_registration?page=1

[20] https://opencorporates.com/officers/us_ca?action=search_officers&commit=Go&controller=searches&inactive=false&position=chief+executive+officer&q=jeff+brown&search_fields%5B%5D=name&user=true&utf8=%E2%9C%93

121. From 2018 to date, Jeri Vincent has been the CFO for all ten managed companies: Antelope Valley Learning Academy Inc.; Alta Vista Public Charter Inc.; Crescent View South Inc.; Crescent View South Inc.; Desert Sands Public Charter Education Inc.; Mission View Public Charter, Inc.; Sierra Educational Advancement; Vista Real Public Charter; and Western Educational Corporation.[21] This fact of a shared CFO indicates a network of shared management and control among all co-defendants, rendering them all affiliates.

122. It is important to note that ten of the defendant companies, namely Crescent Antelope Valley Learning Academy Inc., Alta Vista Public Charter, Inc., Crescent View South Inc., Crescent View West Public Charter Inc., Desert Sands Public Charter, Inc., Diego Plus Education Corporation, Mission View Public Charter Inc., Sierra Educational Advancement Corporation, Vista Real Public Charter, Inc., and Western Educational Corporation, are all under the combined management of and pay annual administrative fees for those management services, to Lifelong Learning Administrative Corp., a fact which solidifies the interlocking management and control relationships between all co-defendants in this action.

123. The ten defendant companies, all under the common management of the parent company Lifelong Learning Administrative Corp., are jointly overseen by seven executives and five directors, all of whom participate in the management and operations of three or more co-defendant companies within the affiliate group.

124. Lifelong Learning Administration Corporation states in its federal income tax filing: *"We strive to increase the operational and economic efficiencies of our partner organizations, including, but not limited to: "**Providing General Operational Management**, files and records administration, public relations oversight, financial services (including accounting, bookkeeping, payroll, and procurement functions), strategic planning and implementation, recommending policies,*

---

[21]
https://opencorporates.com/officers/us_ca?action=search_officers&commit=Go&controller=searches&inactive=false&position=chief+financial+officer&q=Jeri+Vincent+&search_fields%5B%5D=name&user=true&utf8=%E2%9C%93

*rules, regulations and procedures, corporate governance administration, human capital management (e.g. employing principals, administrative staff, and hiring and training teachers) developing curriculum, overseeing school safety, ensuring each school maintains appropriate.....*"

125. Lifelong Learning Administration Corporation states in its Federal Income tax filing (For the 2018 calendar year, or tax year beginning 07-01-2018 and ending 06-30-2019),: *"The organization is not a private foundation because it is an organization organized and operated exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more publicly supported organizations described in section 509(a)(1) or section 509(a)(2). See section 509(a)(3). Check the box in lines 11a through 11d that describes the type of supporting organization and complete lines 11e, 11f, and 11g. Type III - functionally integrated. A supporting organization operated in connection with, and functionally integrated with, its supported organization(s)"*[22]

126. Lifelong Learning Administration Corporation shows the following entities as **"Related Organizations"** inclusive of all Co-Defendant Affiliates: "Antelope Valley Learning Academy Inc., Alta Vista Public Charter, Inc., Crescent View South Inc., Crescent View West Public Charter Inc., Desert Sands Public Charter, Inc., Diego Plus Education Corporation, Mission View Public Charter Inc., Sierra Educational Advancement Corporation, Vista Real Public Charter, Inc., Education Advancement Corporation and Western Educational Corporation."[23]

127. Lifelong Learning Administration Corporation identifies the following entities under **"Transactions With Related Organizations" on their Federal Income tax filings** inclusive of all Co-Defendant Affiliates: "Antelope Valley Learning Academy Inc., Alta Vista Public Charter, Inc., Crescent View South Inc., Crescent View West Public Charter Inc., Desert Sands Public Charter, Inc., Diego Plus Education Corporation, Mission View Public Charter Inc., Sierra Educational Advancement Corporation, Vista Real Public Charter, Inc. and Western Educational Corporation."[24]

---

[22] (For the 2018 calendar year, or tax year beginning 07-01-2018 and ending 06-30-2019), form 990, SCHEDULE A, Part I, Reason for Public Charity Status:
[23] Source: https://www.guidestar.org/profile/47-5307489#divSchedR (fiscal year 2019)

128. Defendant, Lifelong Learning Administration Corporation, receives yearly management and consulting fees from all Co-Defendant Affiliates: Antelope Valley Learning Academy Inc., Alta Vista Public Charter, Inc., Crescent View South Inc., Crescent View West Public Charter Inc., Desert Sands Public Charter, Inc., Diego Plus Education Corporation, Mission View Public Charter Inc., Sierra Educational Advancement Corporation, Vista Real Public Charter, Inc., and Western Educational Corporation. Add more to this section

129. Upon information and belief, the Defendants Antelope Valley Learning Academy Inc., Alta Vista Public Charter, Inc., Crescent View South Inc., Crescent View West Public Charter Inc., Desert Sands Public Charter, Inc., Diego Plus Education Corporation, Mission View Public Charter Inc., Sierra Educational Advancement Corporation,  Vista Real Public Charter, Inc., and Western Educational Corporation, all show as **Supported Organizations for Lifelong Learning Administration Corporation on their Federal Income tax filing** *"Provide the following information about the supported organization(s) (iv) Is the organization listed in your governing document? "YES" was answered for all."*[25]

130. These affiliations between all co-defendants, as detailed, must be used to determine the size of the borrower for purposes of PPP loan eligibility. Lifelong Learning Administration Corporation knew or should have known that it did not meet the PPP loan eligibility standards due to the combined size of its company, taking into account the uncontroverted entity-affiliation facts alleged in ¶¶ 117 – 129 above.

131. The CARES Act's limited waiver of the affiliation rules does not apply to Lifelong Learning Administration Corporation because Lifelong Learning Administration Corporation: (i) is not a business within NAICS category 72; (ii) is not a qualifying franchise; and (iii) does not have

---

[24] (For the 2018 calendar year, or tax year beginning 07-01-2018 and ending 06-30-2019), form 990, SCHEDULE R, Part V, Transactions With Related Organizations:

[25] (For the 2018 calendar year, or tax year beginning 07-01-2018 and ending 06-30-2019), SCHEDULE A, Public Charity Status and Public Support, Form 990, Sch A, Part I, Line 12g –

SBIC investment. *See* 15 USCS § 636(a)(36)(D)(iv). Thus, the affiliation rules apply to Lifelong Learning Administration Corporation and its affiliate companies, co-defendants herein.

### iii. Factual misreporting of the number of Employees and Revenue, as Certified in their Applications, by Lifelong Learning Administration Corporation and its co-defendant affiliates.

132.   Lifelong Learning Administration Corporation, together with its co-defendant affiliates, Relator is informed and believes, and thereon alleges, that Lifelong Learning Administration Corporation knowingly had well in excess of 500 employees at the time it filed its PPP application. *See* 15 USCS § 636(a)(36)(D)(i)(I); SBA FAQ Question 44. Lifelong Learning Administration Corporation, together with its co-defendant affiliates, according to Relator's research, in fact, had approximately **4,937 employees** and an estimated annual gross revenue of over **$332 million** at the time it filed its PPP Application, which numbers clearly exceeded loan qualification employee-count, and revenue limitations for PPP loan eligibility, as set by the SBA and the Government.

133.   Lifelong Learning Administration Corporation reported 287 employees in its PPP application. Upon Relator's information and belief, Lifelong Learning Administration Corporation alone had approximately 263 employees and an estimated annual gross revenue of $44 million at the time of the Lifelong Learning Administration Corporation's PPP application.

134.   Antelope Valley Learning Academy Inc. reported 478 employees in its PPP application. Upon Relator's information and belief, Antelope Valley Learning Academy Inc. had approximately 1,304 employees and an estimated annual gross revenue of $84.9 million at the time of the Antelope Valley Learning Academy Inc. PPP application.

135.   Alta Vista Public Charter, Inc. reported 106 employees in its PPP application. Upon Relator's information and belief, Alta Vista Public Charter, Inc. had approximately 218

employees and an estimated annual gross revenue of $7.4 million at the time of submitting its PPP application.

136. Crescent View South Inc. reported 178 employees in its PPP application. Upon Relator's information and belief, Crescent View South Inc. had approximately 462 employees and an estimated annual gross revenue of $27.7 million at the time of the Crescent View South Inc. PPP application.

137. Crescent View West Public Charter Inc. reported 135 employees in its PPP application. Upon information and belief, Crescent View West Public Charter Inc. had approximately 191 employees and an estimated annual gross revenue of $23.3 million at the time of the Crescent View West Public Charter Inc. PPP application.

138. Desert Sands Public Charter, Inc. reported 139 employees in its PPP application. Upon Relator's information and belief, Desert Sands Public Charter, Inc. had approximately 714 employees and an estimated annual gross revenue of $29.6 million at the time of the Desert Sands Public Charter, Inc. PPP application.

139. Diego Plus Education Corporation reported 61 employees in its PPP application. Upon Relator's information and belief, Diego Plus Education Corporation had approximately 466 employees and an estimated annual gross revenue of $18.8 million at the time of Diego Plus Education Corporation's PPP application.

140. Mission View Public Charter Inc. reported 25 employees in its PPP application. Upon Relator's information and belief, Mission View Public Charter Inc. had approximately 129 employees and an estimated annual gross revenue of $4.4 million at the time of the Mission View Public Charter Inc. PPP application.

141. Sierra Educational Advancement Corporation reported 28 employees in its PPP application. Upon Relator's information and belief, Sierra Educational Advancement Corporation had

approximately 75 employees and an estimated annual gross revenue of $4.4 million at the time of Sierra Educational Advancement Corporation's PPP application.

142. Vista Real Public Charter reported 145 employees in its PPP application. Upon Relator's information and belief, Vista Real Public Charter had approximately 564 employees and an estimated annual gross revenue of $28.9 million at the time of Vista Real Public Charter's PPP application.

143. Western Educational Corporation reported 390 employees in its PPP application. Upon Relator's information and belief, Western Educational Corporation had approximately 544 employees and an estimated annual gross revenue of $58.1 million at the time of Western Educational Corporation's PPP application.

144. Lifelong Learning Administration Corporation, together with its affiliates, abjectly failed to meet the SBA revenue-based size standard for the NAICS code applicable to its primary industry (found in 13 C.F.R. § 121.201). See 15 USCS § 636(a)(36)(D)(i)(II); SBA FAQ Question 3. Despite these facts and glaring eligibility disqualifications, Lifelong Learning Administration Corporation, together with its co-defendant affiliates, knowingly and fraudulently misreported their revenue-based size and income standards, in direct violation of the FCA and of all applicable Government regulations and guidance.

145. Lifelong Learning Administration Corporation's NAICS code is 611710 ("Educational Support Services"), and the applicable revenue-based business size standard for code 611710 is $16 million dollars in gross revenue. Accordingly, Lifelong Learning Administration Corporation could not rely on this size-standard test. Lifelong Learning Administration Corporation far exceeded the maximum allowable amount, $16 Million, with a combined affiliate income of $332 Million. Knowing these facts, Lifelong Learning Administration Corporation and its affiliate entities, nonetheless, fraudulently misreported their size, revenue amounts, and number(s) of employees, all in direct violation of the FCA.

146. Lifelong Learning Administration Corporation and its co-defendant affiliates' primary industry is not NAICS category 72 (accommodations and food service). See 15 USCS § 636(a)(36)(D)(iii). Accordingly, Lifelong Learning Administration Corporation could not rely on that category's divergent and lower business size-standard test to qualify for PPP loans.

147. Lifelong Learning Administration Corporation, on its own, does not meet the receipts/revenue-based size standard established by SBA for the NAICS code applicable to its primary industry (611710), and together with its affiliates, it does not meet the receipts/revenue-based size standard established by SBA for the NAICS code applicable to the higher of its primary industry or the primary industry of itself and its affiliates on a combined basis.21 See 13 C.F.R. § 121.301(a); SBA FAQ Question 2. The applicable revenue-based size standard of $16 million dollars in gross revenue was exceeded by 2075% (two thousand seventy-five percent) in the case of the PPP Loan Applications submitted by co-defendants.

148. Lifelong Learning Administration Corporation had, together with its affiliates, $15 million or more of tangible net worth as of March 27, 2020, and $5 million or more of average net income after Federal income taxes (excluding carry-over losses) for the last two full fiscal years preceding the date of application. See 15 USCS § 632(a)(5)(B); SBA FAQ Question 2.

149. Based on the foregoing, Lifelong Learning Administration Corporation knowingly and fraudulently misrepresented its employee count, gross revenue and net worth, its compliance with the PPP size and affiliation rules, and its eligibility for a PPP loan.

150. Lifelong Learning Administration Corporation's (and its co-defendant affiliates') false certification of employee counts and/or net worth was knowing, material and relied upon, because those false certifications affected Lifelong Learning Administration Corporation's (and its co-defendant affiliates') eligibility for the PPP loans and in-turn influenced the SBA's decision to approve those loans.

151. Additionally, based on the foregoing, upon Relator's information and belief, Lifelong Learning Administration Corporation's other affiliated companies—Antelope Valley Learning Academy Inc., Alta Vista Public Charter, Inc., Crescent View South Inc., Crescent View West Public Charter Inc., Desert Sands Public Charter, Inc., Diego Plus Education Corporation, Mission View Public Charter Inc., Sierra Educational Advancement Corporation, Vista Real Public Charter, Inc., and Western Educational Corporation—also knowingly miscalculated and misrepresented their employee-count, gross revenue and net worth, their compliance with the PPP size and affiliation rules, and their eligibility for a PPP loan.

152. Lifelong Learning Administration Corporation falsely and fraudulently certified that it was in compliance with the applicable size, employee count, gross revenue, net worth and affiliation rules applicable to PPP loans, when in fact it knew it was not in compliance with those rules.

153. The false certifications and representations made by Lifelong Learning Administration Corporation and its co-defendant affiliates regarding their size, finances and affiliations, were relied upon by the Government and allowed Lifelong Learning Administration Corporation and its co-defendant affiliates to obtain PPP funds to which it was not entitled, and to avoid repaying those funds when thus not qualified for loan forgiveness.

**C.    Lifelong Learning Administration Corporation Failed to Repay PPP Loan Funds, for Which It Was Not Entitled to Forgiveness**

154. Relator is informed and believes, and thereon alleges, that Lifelong Learning Administration Corporation and its co-defendant affiliates were ineligible to receive PPP loans and subsequently failed, given the opportunity, to repay the wrongfully acquired PPP loan funds received, which they were, *ab initio,* ineligible for.

155. Based on Relator's information and belief, Lifelong Learning Administration Corporation and its co-defendant affiliates did not take advantage of the SBA's safe harbor (repayment) provisions, which would allow borrowers to repay their misbegotten PPP loans by May 18, 2020, and, by so doing, to be deemed to have made their required certifications of need in good faith. IFR #4 § 5,

as modified by IFR #9 and IFR #13 § 1; SBA FAQ 31, as modified by FAQ Question 43 and FAQ Question 47.

156.    Moreover, as the loans individually and collectively received and retained by Lifelong Learning Administration Corporation and its co-defendant affiliates exceed the statutory sum of two million dollars ($2,000,000.00), they may not be deemed to have made their required certifications in good faith and thus are subject to a full review by the SBA to ensure eligibility and compliance with PPP program requirements. SBA FAQ Question 46.

157.    As alleged above and herein, Lifelong Learning Administration Corporation and its co-defendant affiliates knowingly and fraudulently avoided and/or wrongfully concealed their clear obligations to return misbegotten PPP loan funds to the Government, as allowed by the cited statutory safe harbor provisions.

## VI.    LEGAL CLAIMS

### COUNT I Violation of the False Claims Act
### (31 U.S.C. § 3729(a)(1)(A))

158.    Relator repeats and realleges each of the foregoing paragraphs and allegations, as though fully set forth herein.

159.    Lifelong Learning Administration Corporation, Antelope Valley Learning Academy Inc., Alta Vista Public Charter, Inc., Crescent View South Inc., Crescent View West Public Charter Inc., Desert Sands Public Charter, Inc., Diego Plus Education Corporation, Mission View Public Charter Inc., Sierra Educational Advancement Corporation, Vista Real Public Charter, Inc., and Western Educational Corporation, all, jointly and severally, violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), by knowingly presenting and/or causing to be presented to the SBA false and/or fraudulent claims for payment or approval in connection with their applications for, receipt of (and failure to repay) PPP loans.

160.    Upon Relator's information and belief, the United States paid, authorized and/or approved the false and/or fraudulent claims submitted by defendants because of and reliance on

defendants Lifelong Learning Administration Corporation, Antelope Valley Learning Academy Inc., Alta Vista Public Charter, Inc., Crescent View South Inc., Crescent View West Public Charter Inc., Desert Sands Public Charter, Inc., Diego Plus Education Corporation, Mission View Public Charter Inc., Sierra Educational Advancement Corporation, Vista Real Public Charter, Inc., and Western Educational Corporation's representations, which payments, authorizations or approvals of PPP loans would not have been paid or approved but for all affiliated co-defendants' unlawful conduct. The Government, the SBA and their approved lenders, as well as the United States Taxpayers, all incurred substantial and provable monetary damages as a result of Defendants' fraudulent misconduct, in total amounts according to proof.

161. Lifelong Learning Administration Corporation, Antelope Valley Learning Academy Inc., Alta Vista Public Charter, Inc., Crescent View South Inc., Crescent View West Public Charter Inc., Desert Sands Public Charter, Inc., Diego Plus Education Corporation, Mission View Public Charter Inc., Sierra Educational Advancement Corporation, Vista Real Public Charter, Inc., and Western Educational Corporation's conduct was knowing in that all affiliated co-defendants had actual knowledge that the claims, certifications, and statements made in connection with their applications for PPP loans and/or PPP loan forgiveness, were false and fraudulent and all co-defendant affiliates nevertheless intentionally submitted those false and fraudulent claims, certifications, and statements in order to receive and/or retain funds to which they were not legally entitled.

**COUNT II Violation of the False Claims Act**
**(31 U.S.C. § 3729(a)(1)(B))**

162. Relator repeats and realleges each of the foregoing paragraphs and allegations, as though fully set forth herein.

163. The named and affiliated Co-Defendants, Lifelong Learning Administration Corporation and its affiliated companies and entities: Lifelong Learning Administration Corporation, Antelope Valley Learning Academy Inc., Alta Vista Public Charter, Inc., Crescent View South Inc., Crescent View West Public Charter Inc., Desert Sands Public Charter, Inc., Diego Plus Education

Corporation, Mission View Public Charter Inc., Sierra Educational Advancement Corporation, Vista Real Public Charter, Inc., and Western Educational Corporation, all, both independently, jointly and severally, violated the provisions of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using or causing to be made or used, false records, certifications of fact or statements: (i) material to false or fraudulent claims for payment of loans, by lenders, authorized by the SBA; and/or (ii) in order to fraudulently induce PPP loan funding to be paid or approved; and (iii) which claims the United States did in-fact pay or approve, all in connection with Lifelong Learning Administration Corporation and its co-defendant affiliates' receipt of (and failure to repay) PPP loans.

164. Upon Relator's information and belief, the United States paid or approved Defendants' false and/or fraudulent claims and applications because of Lifelong Learning Administration Corporation, Antelope Valley Learning Academy Inc., Alta Vista Public Charter, Inc., Crescent View South Inc., Crescent View West Public Charter Inc., Desert Sands Public Charter, Inc., Diego Plus Education Corporation, Mission View Public Charter Inc., Sierra Educational Advancement Corporation, Vista Real Public Charter, Inc., and Western Educational Corporation's acts and representations, which funding would not have been paid or approved but for all defendant affiliated entities' unlawful and fraudulent conduct, thereby incurring monetary damages as a result, as herein set forth and according to further proof.

165. Lifelong Learning Administration Corporation and all of its co-defendant affiliate entities, had actual knowledge that the claims, certifications, and statements made in connection with their application for PPP loans and/or PPP loan forgiveness were false and fraudulent, and Lifelong Learning Administration Corporation along with all of its co-defendant affiliate entities nevertheless intentionally submitted those claims, certifications, and statements in order to receive and/or retain funds to which they were not legally entitled.

**COUNT III Violation of the False Claims Act's Reverse False Claims Provision
(31 U.S.C. § 3729(a)(1)(G))**

166.  Relator repeats and realleges each of the foregoing paragraphs and allegations, as though fully set forth herein.

167.  Defendants and affiliated co-defendants Lifelong Learning Administration Corporation, Antelope Valley Learning Academy Inc., Alta Vista Public Charter, Inc., Crescent View South Inc., Crescent View West Public Charter Inc., Desert Sands Public Charter, Inc., Diego Plus Education Corporation, Mission View Public Charter Inc., Sierra Educational Advancement Corporation, Vista Real Public Charter, Inc., and Western Educational Corporation violated the so-called "reverse false claim" provision of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G), by knowingly making or using a false record or statement for the purpose of avoiding or decreasing an obligation owed to the United States in connection with their receipt of (and failure to repay) PPP loans.

168.  Defendants and affiliated co-defendants Lifelong Learning Administration Corporation, Antelope Valley Learning Academy Inc., Alta Vista Public Charter, Inc., Crescent View South Inc., Crescent View West Public Charter Inc., Desert Sands Public Charter, Inc., Diego Plus Education Corporation, Mission View Public Charter Inc., Sierra Educational Advancement Corporation, Vista Real Public Charter, Inc., and Western Educational Corporation retained overpayments or avoided an obligation to repay PPP loan funds to the Government, and the United States incurred substantial monetary damages as a result.

169.  Defendants and affiliated co-defendants Lifelong Learning Administration Corporation, Antelope Valley Learning Academy Inc., Alta Vista Public Charter, Inc., Crescent View South Inc., Crescent View West Public Charter Inc., Desert Sands Public Charter, Inc., Diego Plus Education Corporation, Mission View Public Charter Inc., Sierra Educational Advancement Corporation, Vista Real Public Charter, Inc., and Western Educational Corporation's conduct was knowing in that Lifelong Learning Administration Corporation, and their affiliated co-defendants had actual knowledge that the claims, certifications, and statements made in connection with their applications for PPP loan forgiveness were false and fraudulent, and nevertheless intentionally

COMPLAINT
44

submitted those claims, certifications, and statements in order to retain and avoid repayment of funds to which it was not legally entitled.

**RELIEF REQUESTED**

WHEREFORE, Relator, acting on behalf of and in the name of the United States and on its own behalf, demands and prays that judgment be entered against Lifelong Learning Administration Corporation, Antelope Valley Learning Academy Inc., Alta Vista Public Charter, Inc., Crescent View South Inc., Crescent View West Public Charter Inc., Desert Sands Public Charter, Inc., Diego Plus Education Corporation, Mission View Public Charter Inc., Sierra Educational Advancement Corporation, Vista Real Public Charter, Inc., and Western Educational Corporation as follows:

That Lifelong Learning Administration Corporation, Antelope Valley Learning Academy Inc., Alta Vista Public Charter, Inc., Crescent View South Inc., Crescent View West Public Charter Inc., Desert Sands Public Charter, Inc., Diego Plus Education Corporation, Mission View Public Charter Inc., Sierra Educational Advancement Corporation, Vista Real Public Charter, Inc., and Western Educational Corporation cease and desist from further violating the False Claims Act, 31 U.S.C. §§ 3729 et seq;

        A.        That Lifelong Learning Administration Corporation, Antelope Valley Learning Academy Inc., Alta Vista Public Charter, Inc., Crescent View South Inc., Crescent View West Public Charter Inc., Desert Sands Public Charter, Inc., Diego Plus Education Corporation, Mission View Public Charter Inc., Sierra Educational Advancement Corporation, Vista Real Public Charter, Inc., and Western Educational Corporation pay an amount equal to three times the amount of damages the United States has sustained because of the Defendants' actions, plus civil penalties as are required by law in the amount of not less than $11,665 and not more than $23,331 for violation of the False Claims Act, and post-judgment interest, costs, and such other relief as may be necessary and proper;

B.       That Defendants return to the Government all of their ill-gotten loan proceeds in the approximate sum, as hereafter calculated, in excess of $32,000,000.00 (Thirty-Two Million Dollars);

C.       That Relator be awarded the maximum sum allowed pursuant to 31 U.S.C. § 3730(d)(1)-(2);

D.       That Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d); and

E.       That The United States and Relator be granted such other and further relief as the Court deems just and appropriate.

**RELATOR HEREBY DEMANDS A TRIAL BY JURY FOR ALL ISSUES SO TRIABLE**

Respectfully submitted,

Plaintiff,

UNITED STATES OF AMERICA *ex rel.* TAXPAYERS AGAINST FRAUD, LLC

Date: April 12, 2024                          By their attorney(s),

Arthur E. Fisher, Esq;
A Fisher Legal Services, Inc. A.P.C
Counsel for Plaintiff(s)-Relator

COMPLAINT
46